## GRAND CHUTE *v.* WINEGAR.

### [AT LAW.]

1. On an issue of fact raised by a plea in abatement, where the defendant holds the affirmative of the issue, and where the evidence (introduced by the defendant himself) is all in favor of the plaintiff, positive and uncontradicted, the court properly instructs the jury when it directs them, as matter of law, to find the issue for the plaintiff.

2. To a suit on a bond the defendant, it would seem, may well enough plead both *nil debet* and *non est factum*. At least there is apparently no inconsistency in the pleas. It would therefore be a mistake in a court to strike out a plea of *non est factum* because inconsistent with a plea of *nil debet;* and if any prejudice occurred to the defendant by such striking out, there would be difficulty in sustaining a judgment rendered for the plaintiff. However, where it was plain that though such a plea was technically struck out, no evidence was rejected on account of its absence, but that the defendant litigated every question of fact as fully as if that pleading had remained, and that though much evidence offered by the defendant was rejected, none was so rejected because of the absence of a proper plea, this court refused to reverse.

3. A plea in bar, which is, in substance, the same as a plea in abatement, already passed on by a jury against the party setting it up, is properly stricken out by the court before trial.

4. In a suit against a municipal corporation by a *bonâ fide* holder of its bonds, whose title accrued before maturity, the corporation cannot show by way of defence, if the legal authority of the corporation to issue the bonds is sufficiently comprehensive, a want of compliance on its part with formalities required by the statute authorizing the issue of the bonds, or show fraud in their own agents in issuing them. The cases of *Woods* v. *Lawrence County* (1 Black, 386); *Mercer County* v. *Hacket* (1 Wallace, 83); *Gelpcke* v. *The City of Dubuque* (Ib. 175); and *Meyer* v. *The City of Muscatine* (Ib. 384), acted upon as settling the law on this point.

ERROR to the Circuit Court for the Eastern District of Wisconsin; the case being thus:

By the first section of an act of the 10th of February, 1854, the legislature of Wisconsin authorized the boards of supervisors of Grand Chute, Greenville, Hortonia, and certain other towns along the course of a contemplated plankroad in Wisconsin, named the Wolf River Branch Plankroad, to subscribe in behalf of said towns or any of them, "*under the restrictions and conditions hereinafter named,*" to the capital stock of the said plankroad company, *such amounts,* not exceeding $10,000, for any one town, *as may be declared by the board of directors of said company necessary for the completion of said road at the time of such subscription,* and to pay for the same in bonds of the town or towns so subscribing, payable in fifteen years from the date thereof with interest, at a rate not exceeding ten per cent. per annum, payable annually, at such place within or without the boundaries of this State as shall be therein named.

Subsequent sections of the act read thus:

"SECTION 6. No bonds shall be issued by any town in pursuance of this act, unless a majority of the votes cast in said town, at the election hereinafter mentioned, shall be in favor of the same.

"SECTION 7. A special election shall be called and held in each of the towns before named, for the purpose of carrying this act into effect within six months after the passage of this act. At

such election, those voting in favor of the subscription of stock, and the issuing of bonds in accordance with the provisions of this act, shall put in ballots having inscribed on them the words 'FOR THE ROAD,' and those voting against such subscription and issue of such bonds, shall put in ballots inscribed with the words 'AGAINST THE ROAD.' Notice of such election shall be given for two weeks successively next preceding said election, in some newspaper printed in the county where the town so voting is situated. And such elections and the canvass thereof, shall be held at the same place, and conducted by the same persons, and in the same manner in all respects as the annual town meetings of each town."

On the 12th of March, 1855, certain bonds were issued in form thus:

## [No. 5.]

### TOWN OF GRAND CHUTE BOND.

Whereas, the legislature of the State of Wisconsin, on the tenth day of February, A.D. 1854, passed an act authorizing and empowering the board of supervisors of the town of Grand Chute to subscribe, for the town of Grand Chute, ten thousand dollars to the capital stock of the Wolf River Branch Plankroad Company, and to pay for the same in the bonds of the town, payable in fifteen years; and whereas the said board of supervisors, at a meeting of their board, did agree, by resolutions of said board, to subscribe the sum of $10,000 to the stock of the Wolf River Branch Plankroad Company, and that the said town issue bonds to the amount of said subscription to the said plankroad company, and that the said bonds be signed by the chairman of said board, under the seal of said town:

Now, therefore, for the *purpose of carrying out the provisions of the said act of the legislature,* and in accordance with the resolutions of the said board as aforesaid:

Know all men by these presents that the town of Grand Chute, in the county of Outagamie, and State of Wisconsin, is held and firmly bound unto the Wolf River Branch Plankroad Company, or bearer, in the sum of ONE THOUSAND DOLLARS, lawful money of the United States of America, to be paid to said plankroad company, or bearer, or their successors or assigns, for which full payment, well and truly to be made, the said

town binds itself firmly by these presents, and hereby pledges, irrevocably, the said stock and the proceeds thereof.   Dated the 12th day of March, A.D. 1855.   Sealed with the seal of said town.

The condition of the above obligation is such, that if the said town of Grand Chute shall pay, or cause to be paid, to the said Wolf River Branch Plankroad Company, or their successors or assigns, or to the bearer hereof, the just and full sum of one thousand dollars in fifteen years from the 12th day of March, A.D. 1855, with interest annually at the rate of 10 per cent. per annum until paid, said principal and interest to be paid at Appleton, in the State of Wisconsin, then the above obligation to be void; otherwise to remain in full force and virtue.

[SEAL.]                              THEODORE CONKEY,
          Chairman of Board of Supervisors town of Grand Chute.

To the bond were annexed fifteen coupons, in form thus:

[No. 1.]

The town of Grand Chute will pay to the holder hereof, eighty-eight and $\frac{85}{100}$ dollars on the first day of February, 1856, at Appleton, Wisconsin, on the presentation hereof, being the interest due that day on the bond of said town, No. 5.

                              THEODORE CONKEY,
                                             Chairman.

Nine of these bonds with the coupons being in the control or ownership of one Winegar, he brought suit against the town of Grand Chute in April, 1870, in the court below, describing himself as " a citizen of the State of New York."   The town of Grand Chute pleaded in abatement, to the effect that the Circuit Court of the United States had no jurisdiction over the action for the reason that at the time of the commencement of the action, a portion of the bonds ($5500) sought to be recovered, were held and owned by one Henry Hewett, and the residue by one Theodore Conkey; that Conkey and Hewett were the real plaintiffs in interest in the action, that they were citizens of the State of Wisconsin, and, therefore, that the court could not take cognizance of the action.   The plea in abatement further alleged that the bonds were not issued in good faith

or for any valuable consideration, but were procured and issued by the fraudulent contrivance of Hewett, Conkey, and one Reeder Smith, who was the president of the plank-road company for whose benefit the bonds were authorized to be issued, and the substance of the fraud was briefly stated.   Issue was joined on this plea, and the deposition of the plaintiff, Winegar, was himself taken *by the defendant* to prove the affirmative of it.   Winegar swore that he purchased the bonds of Goodwin, as the agent of Hewett, at the First National Bank of Union Springs, Cayuga County, N. Y., for $5100, payable $2500 in one year, and $2600 payable in two years, with 7 per cent. interest.   That he had negotiated for the bonds a year and a half or two years before he purchased; that he purchased the bonds in January, 1870; purchased them for speculation; that he "had no reason to believe that they were any other than good and valid bonds;" that he " so believed at the time he made the purchase; that the purchase was made by him in good faith and without any knowledge or information that they were other than good and valid bonds; that he in equal good faith gave his notes, and that they would be met;" that he lived at Union Springs, Cayuga County, N. Y.; that he was the teller of a bank there, and had lived there for nearly four years before he brought the suit.   He testified also that he never had the bonds in his possession, that he had a bill of sale of them, and they were subject to his order, and that the bill of sale was signed by Goodwin as the agent of Hewett, the seller.   The court directed the jury on this evidence— the only evidence taken on the issue raised by the plea in abatement—to find the issue for the plaintiff.   An exception was taken to the direction.

After this decision of the plea in abatement, the plaintiff asked for final judgment in his favor on the verdict, which the court declined to grant.   Thereupon the town of Grand Chute put in nine special pleas, of which certain ones only need be mentioned.

1st. *Nil debet.*

2d. *Non est factum.*

3d. That the act authorizing the town of Grand Chute to subscribe for plankroad stock and issue bonds in payment, "was not published pursuant to the constitution and laws of said State of Wisconsin, at or prior to the time of the calling, holding and canvass of the special election prescribed by said act, to wit: on the 20th day of May, 1854."

4th. That the town of Grand Chute was not authorized to subscribe to the stock of the plankroad in question.

5th. That the board of directors of the plankroad company had not declared, as the 1st section of the act required them to do, what " amount was necessary for the completion of the road."

7th. That no special election, such as the act prescribed, had been called or held, previous to the issue of the bonds.

8th. That Hewett owned $5500 of the bonds in suit, that Conkey owned the residue, and that they, and not Winegar, were the real parties in interest in the action. That the bonds were not issued in good faith or for any valid consideration, but were procured by fraud, deception, and by collusion between Hewett, Conkey, and Reeder Smith, president and general agent of the plankroad company, in pursuance of a corrupt agreement, whereby Smith received a contract at an extravagant price and Conkey received the privilege of paying off the workmen from his store at a large profit; that a change in location was made to the injury of the road, but for the benefit of the conspirators; that Hewett signed a writing purporting to bind him, and that the bonds were fraudulently delivered to Hewett before he had performed any part of the work or even commenced it. The plea was a very long plea, covering nearly four pages of twice as much type as one of the ordinary pages of these Reports; it amplified all the above matter; inserted copies of the agreement with Hewett, and specified the mode and manner in which the fraud was alleged to have been effected. [The reader will observe that this eighth plea resembled the plea in abatement already mentioned.]

9th. That the bonds were not executed and delivered to the plankroad company for the purpose of carrying out the

provisions of any act of the legislature, or for a valid consideration; that the company did not sell the same to *bonâ fide* holders for a valuable consideration; that the same had not passed from hand to hand like other negotiable securities, and had not as such come to the hands of the plaintiff: that they were a part of $10,000 of bonds procured to be issued by fraud and deception, and by collusion between Conkey, chairman of the town board, Smith, president of the plankroad company, and Hewett, a contractor, and divers other persons, and in pursuance of a conspiracy for the purpose of defrauding the defendant and the creditors and stockholders of the plankroad company. The plea contained other allegations of the same general character.

These pleas being filed, the plaintiff moved the court to strike off the second of them, as inconsistent with the first; and also to strike off the eighth, as embracing the same matter as was in the plea in abatement. This motion the court granted, the defendant excepting.

The plaintiff then filed replications to the first and fourth pleas, and demurred to the third, fifth, seventh, and ninth. The court sustained the demurrers.

On the trial of the issues of fact, the plaintiff offered to read the act of the Wisconsin legislature, of February 10th, 1854, in evidence, and the defendant objected, because it had no applicability to the case, and did not authorize the issuing of the bonds. The court, however, allowed the act to be read, and also the bonds and coupons.

The plaintiff, after having put in his bonds and coupons, here rested.

The defendant, on its part, offered to read in evidence the deposition of the plaintiff, Winegar, it being the same that was read on the issue in abatement. The plaintiff objected, on the ground that the same was *incompetent, irrelevant, and immaterial,* and that the same was not admissible under the pleadings. The court sustained the objection, and ruled out the deposition; the defendant excepting.

The defendant then offered the record of a suit brought in the court below, October 21st, 1861, in the name of Henry

Decker, Jr., against the town of Grand Chute, on some of the same coupons which appeared in this action; the record being offered to show that the bonds and coupons were in litigation at that early date. The record showed a suit begun, carried on to .a certain point, and then before trial *discontinued.* The court ruled the record out *on the ground of irrelevancy;* the defendant excepting.

The defendant then offered the record of a suit brought in the Circuit Court of Wisconsin, November 17th, 1856, in the name of the Wolf River Branch Plankroad Company, for the use of Henry Hewett, against the town of Grand Chute; also, the record of an action brought in the same court, August 28th, 1857, in the name of the *State of Wisconsin, ex rel. Henry Hewett* v. *The Board of Supervisors of the Town of Grand Chute;* also, the record of an action brought in the same court, September 9th, 1857, in the name of *Henry Hewett* v. *The Town of Grand Chute,* together with the certified copy of the opinion of the Supreme Court of the State of Wisconsin, on appeal in the action, given September 10th, 1858; all being offered to show the pendency of actions involving the validity of the same bonds and coupons in question in this action, prior to the time that this plaintiff, Winegar, pretended to have become the *bonâ fide* owner, holder, and bearer of the said bonds and coupons, and that, therefore, it was impossible for him to be what he professed to be.

[The said suits showed that the subject-matter of this action was in litigation before and at the several times when the said several suits were pending, and that the said suits were discontinued several years before this action was brought.]

The plaintiff's counsel objected to all this evidence *on the ground of irrelevancy;* and the court ruled it out, the defendant excepting.

The defendant's counsel then offered in evidence a bill in equity, filed in the court below on the 5th day of August, 1870, wherein the town of Grand Chute was complainant, and Winegar, Hewett, Conkey, and Goodwin defendants,

and also offered in evidence all the papers and records in the case, including the demurrer to the bill of complaint.

This bill was one charging that the bonds and coupons now in suit had been issued without authority, in violation of law, and in fraud of the town of Grand Chute, by Goodwin, Hewett, and Conkey; that, for the reasons set forth in the bill, they had no legal force or validity; that the transfer of the same to Winegar was colorable merely; that he was a man of no responsibility; that he paid no valuable consideration on the pretended purchase; that he knew all the facts in relation to their issue, and that he never had any right or title to said pretended bonds, or to any of them. It further alleged that Winegar was a citizen of the State of New York, and that the other defendants were citizens of Wisconsin, and that Winegar had commenced an action in the Circuit Court of the United States for Wisconsin against the town of Grand Chute, to recover the amount of the said nine bonds. The bill prayed that an injunction might be issued restraining Winegar and his confederates from the further prosecution of the bonds, and that the same be adjudged to be fraudulent and void, and be decreed to be cancelled. The record offered showed that the bill had been demurred to; that no injunction had issued on the bill, and that the bill itself had been dismissed. The plaintiff objected to the evidence *on the ground of irrelevancy and immateriality*, and because it was inadmissible under the pleadings. The court ruled out the evidence deciding that the same was " not proper:" the defendant excepting: the court equally ruling out the record when in addition it showed an appeal, undetermined, to this court.*

The defendant then offered town records of Grand Chute, and evidence to show that some of the facts recorded in them as true about these bonds were not true; and that after a location of the road had been actually fixed on, it had been changed to a different one, for the benefit of persons interested in the bonds, and to the disadvantage of the

---

* See *infra*, p. 373.

Town of Grand Chute; and that persons who were interested in having the bonds issued had by fraudulent means procured them to be issued. But the court refused to let any of the evidence, or any of the same sort, of which there was a good deal, go in; there being nothing in any of it tending to show that the plaintiff had anything to do with any of these alleged frauds; ever knew of them before he got his bonds, or was other than a *bonâ fide* holder of them for value.

Under instructions of the court the jury found a verdict for the plaintiff; and judgment going accordingly, the defendant brought his numerous exceptions already mentioned here.

*Mr. G. W. Lakin, for the plaintiff in error :*

1. The court erred in peremptorily ordering a verdict for the plaintiff on the issue raised by the plea in abatement. The defendant went into the enemy's camp for testimony. He extorted from the plaintiff a few facts reluctantly given. It was the constitutional right of the defendant that the jury should weigh the testimony and return a verdict agreeably to their convictions. To instruct the jury "to find the issue for the plaintiff," was an arbitrary infringement of that common law and constitutional right.

2. The court erred in ordering the second plea, that of *non est factum*, to be struck out. The alleged reason was that it was inconsistent with the first plea. But the law of pleading does not require that one separate and independent plea shall be consistent with another separate and independent plea. Each plea stands or falls by its merits. The reason which was the basis of the ruling, if it were true, would be no sufficient reason. But it is not true. How is *nil debet* inconsistent with *non est factum ?* The defendant "owes nothing"—the bonds "are not its deed." It owes nothing, *because* the bonds are not its deed—because they are a forgery, a fraud, were made without authority. So far from being inconsistent, the second plea is a logical reason for the first.

3. The court erred equally in striking out the eighth plea.

Its object, end, and aim were different from the object, end, and aim of the plea in abatement. One sought to abate; the other to bar. It set forth facts sufficient to bar. The plea in abatement, so far as it did more than set up the pretended citizenship of Winegar, was surplusage.

4. The court erred in sustaining a demurrer to the third plea, which sets up the non-publication of the act of the legislature under which the bonds purport to have been issued.*

5. The court erred in sustaining a demurrer to the fifth plea. The act, under and by virtue of which the plaintiff pretends that the bonds were issued, and which act is referred to on the face of the bonds and in the declaration as the only foundation thereof, limits all concerned. The subscriptions are not to exceed $10,000, and, before they can exceed one dollar, a prerequisite is interposed. It must be ascertained definitely, in due form, by the declaration of the board of directors, what sum is necessary for the completion of the road. Until that is done there is no authority to subscribe a dollar. Such declaration, by the act, is designated as the corner-stone of the contemplated edifice. The plea declares its non-existence. The legislative act must be followed, or else it may as well be dispensed with altogether. No one pretends that, without it, the bonds would be legal, or good for anything. How can they be valid without any attempt at complying with its most prominent and essential provision; that which may be denominated its jurisdictional provision?

6. The court erred in sustaining a general demurrer to the seventh plea, which alleges that no special election, such as is prescribed in said act of February 10th, 1854, was called or held, previous to the issue of the bonds, &c. The act absolutely prohibits the issuing of any bonds, until that election is had. And here it stands admitted on the record that no election was had. And the court overrides the law, and adjudges that no election was necessary. To adjudge that

---

* The Town of Rochester *v.* The Alfred Bank, 13 Wisconsin, 432.

no act at all was necessary as a foundation for the issue of the bonds would be as reasonable.

7. There was error in sustaining a general demurrer to the ninth plea. The demurrer admits the truth of all that is alleged in the plea. It places Winegar in no better position for a recovery than are the real parties who stand behind him. And it then shows the numerous acts of fraud, collusion, and conspiracy which taint the whole thing and render the paper void. Even if Winegar were the actual purchaser of the void bonds, which were issued without authority of law, he could not recover. *Marsh* v. *Fulton County** decides that point and disposes of the case.

So the case of *Smith* v. *Sac County*,† the bonds sued on there belonged to the same class as the bonds here. In that case the bonds were fair on their face, and payable to bearer. But Meservy, a contractor to whom they issued, and the county judge had a fraudulent understanding about them. After the negotiable paper had been "concocted" and the official seal affixed by the judge, one of the $1000 bonds was immediately presented by Meservy to him. This court says:

"That the bonds should turn up in the possession of some one else was to be expected. But, to hold that after all this was shown in defence, such holder should have judgment on these bonds, without any proof that he purchased them for value, or that he gave any consideration for them at all, is, in our judgment, pushing the doctrine which gives sanctity to negotiable paper beyond any just principle or any decided case."

The court held the bonds void. There was no element of fraud in that case which does not appear in the case at bar. "That the bonds should turn up in the possession of some one else" (Winegar) "was to be expected." Conkey, Hewett & Co. had long been scheming. They at last conceived the plan of having the bonds *transferred for value.* And the plaintiff was selected as the transferee, *and his notes the value.* In *Smith* v. *Sac County* all forms and precedents were ob-

---

* 10 Wallace, 680.        † 11 Id. 189.

served in the creation of the bonds. The proper officer issued, sealed, and delivered them to Meservy, the contractor, who immediately bestowed one of them, of the denomination of $1000, on the judge.

8. The court erred in allowing the bonds and coupons to be read in evidence. Without some valid act of the legislature with which the bonds can be identified as their foundation, and as their authority for being issued, they are surely void.

9. The court erred in ruling out the deposition of the plaintiff, Winegar, offered to be read by the *defendant* at the trial. It was certainly competent for the defendant to show on the trial that the plaintiff had notice of the nature, character, and the frauds connected and identified with the bonds; when, where, and how he came by them; whether he gave any, and what value for them? The defendant had a legal right to testimony of the plaintiff when he spoke on these points, and to make the most of it, as coming from the party whose interest was largely in favor of a recovery. Whatever spark of testimony could be obtained from it, which pointed the other way, could be fastened upon. A few such sparks were evolved; and the defendant had a right to them, and to point them out, and to urge them to the jury. "Incompetency," "irrelevancy," "immateriality," and "inadmissibility," were the alleged grounds of rejecting the testimony. But it is clear that nothing beyond those naked terms was ever manifested to the parties, or to their counsel, to show why the testimony of the adverse party was thus summarily rejected.

10. There was error in rejecting the several records offered in evidence by the defendant, which showed that coupons of these bonds had been repeatedly litigated in courts of record without a recovery ever being had upon them. The records show what defences were interposed, and that the character of these bonds and coupons was made public very soon after their issue.

11. There was error in rejecting the bill in equity, and the records in the case, on the equity side of the court below. That bill was filed in the same court in which the action at

law was pending. It commenced at the root of the fraud and traced it connectedly down. It proceeded against all the fraudulent parties. The bill sought to have the bonds cancelled of record. No clearer case of fraud brought home to and identified with the plaintiff in the action at law, Winegar, the pretended owner of the bonds, can be stated than is stated in the bill. The equity suit covered the whole ground. The demurrer admitted the truth of every allegation; and why, with the whole bill thus admitted to be true, the court ruled out the bill and the whole record, we know not.

12. There was error in ruling out the town records, and the proof offered of the changing of the location of the road for the benefit of the parties who procured the issuing of the bonds. And in ruling out the offer to show that the bonds were procured to be issued by fraudulent means, by persons who were interested in their being issued, and error in other rulings, as well as in the charge of the court to return a verdict for the plaintiff.

*Mr. H. L. Palmer, contra.*

Mr. Justice HUNT delivered the opinion of the court.

The first alleged error of which complaint is now made is the direction of the court to the jury that they find the issue for the plaintiff on the plea of abatement where issue had been joined and testimony taken. The defendant held the affirmative of the issue, and attempted to sustain his case by calling Winegar, the plaintiff on the record.

Winegar swore that he had purchased the bonds on which the suit was brought of Goodwin; that he was the absolute owner of them; that he gave for them his notes for $5100, payable in one and two years, at seven per cent. interest, and that the purchase was made in good faith, with no knowledge or information that the bonds were not valid and with no reason to believe they were not. He testified also that he never had the bonds in his possession, that he had a bill of sale of them, and they were subject to his

order, and that the bill of sale was signed by Goodwin as the agent of Hewett, the seller.

There was no evidence here that would have justified a finding by the jury that Winegar was not the *bonâ fide* owner for value of the bonds in suit. He was the defendant's witness, and no other witness was called upon the issue. If the jury had found otherwise it would have been the duty of the judge to set aside the verdict as unsupported by evidence and in hostility to all the evidence given. There was no error in this charge.

Upon the decision of the plea in abatement the plaintiff asked for final judgment in his favor upon the verdict. Of the refusal to comply with this request, the plaintiff makes complaint, but as he ultimately succeeded in the suit, that result wipes out all exceptions on his part. Upon this refusal the defendant interposed nine special pleas. The plaintiff moved to strike from the record the second of the said pleas as being inconsistent with the fact, and this motion was granted. The first of the said pleas was that the defendant did not owe the moneys demanded or any part thereof in manner and form as the plaintiff had complained against it. The second plea was that the said supposed writings were not, nor were any of them, the deed of the defendant. It is not easy to see the inconsistency of these two defences. If the defendant had never executed the bonds, it would be very likely it did not owe the moneys in them agreed to be paid. So again it might well be that if it did not owe the money it had never executed the bonds. If not an error in striking out the second plea, there certainly was an erroneous reason given for it. If any prejudice had occurred to the defendant from striking out the plea of *non est factum* there would be difficulty in sustaining the judgment. But the record shows none. Indeed it is evident that although the plea was technically excluded, no evidence was rejected on account of its absence, but that the defendant litigated every question of fact as far and as fully as it would have done if this pleading had remained. Numerous offers of evidence were indeed objected to by the

plaintiff and rejected by the court, but the objection was, in a few instances, only based on the character of the pleadings and then in connection with the objection of irrelevancy and incompetency. In no instance was the rejection placed upon the absence of a proper plea. The objection was sometimes expressed to be on the ground of the irrelevance and immateriality of the evidence offered, and in the remaining instances it is evident, from the nature of the offers, that the objection and decision were upon that ground. Among these were the offers of the pleadings in the equity suit still undecided, and again after its dismissal, and including his own bill of complaint, also the book of records of the town clerk's office, also the location of the plankroad, also that it was changed to a different route for the benefit of the parties who procured the issuing of the bonds, and much other evidence of a similar character. It does not appear that any evidence on the point of the actual signing and delivering of the bonds was rejected by the court, or that any harm was sustained by the defendant, from the absence of his plea of *non est factum.*

A further answer to this objection is given in the plaintiff's brief, to wit: that the allowance of double pleas and defences is not a matter of absolute right, but of discretion in the court, and that the courts constantly exercise their discretion in controlling this privilege by disallowing sham or inconsistent pleas.*

The eighth plea was, on motion of the plaintiff, stricken out for the avowed reason that it embraced the same matters as had already been set up and passed upon in the plea in abatement. The pleas are the same in substance and effect. The eighth plea contains the same matter which is in the fifth, though in the eighth it is set forth with much fulness of detail, giving copies of the agreement with Hewett, and specifying the mode and manner in which the fraud, which both the pleas set up, was alleged to have been effected.

---

* See the language of Mr. Justice Story in Ex parte Davenport, 6 Peters, 661.

The two pleas are, however, as has been already said, the same in substance and effect. A party having his plea in abatement passed upon by a jury, and found against him, is not permitted to set up the same matter in bar and again to go to the jury upon it.*

Numerous objections were taken, and in a variety of forms, which fall within the principles of *Knox County* v. *Aspinwall*,† *Mercer County* v. *Hackett*,‡ and *Meyer* v. *The City of Muscatine*.§ The most of the objections, which we have already referred to, were decided not upon the pleadings, but upon the principle of these cases. In *Knox County* v. *Aspinwall* Mr. Justice Nelson thus states the question: "The main ground of the defence relied upon to defeat the recovery is, that the defendant, the board of commissioners, possessed no authority to execute, or to authorize to be executed, the bonds in question, and hence that they are obligations not binding upon the County of Knox, which this board represents. Our chief inquiry, therefore, will be whether or not these several obligations were executed and put into circulation as evidence of indebtedness by competent legal authority." Upon the inquiry thus put the decision is stated by the reporter in the following language: "Where the statute of a State provided that the board of commissioners of a county should have power to subscribe for railroad stock, and issue bonds therefor, in case a majority of the voters of the county should so determine after a certain notice should be given of the time and place of election, and the board subscribed for the stock and issued the bonds, purporting to act in compliance with the statute, it is too late to call in question the existence or regularity of the notices in a suit against them by the holders of the coupons attached to the bonds, who were innocent holders. In such a suit, according to the true interpretation of the statute, the board were the proper judges whether or not a majority of the votes of the county had been cast in favor of the sub-

---

* 1 Chitty on Pleading, 457 a; Coxe *v.* Higbee, 6 Halsted, 395.
† 21 Howard, 539.    ‡ 1 Wallace, 83.    § Ib. 384.

scription. The bonds on their face import a compliance with the law under which they were issued, and the purchaser was not bound to look further for evidence of a compliance with the condition of the grant of the power."

In *Woods* v. *Lawrence County*,* it was held that where the statute requires the grand jury to fix the amount of a subscription to railroad stock, and to approve of it, and upon their report being filed empowers commissioners to carry the same into effect by making its subscription in the name of the county, and if these things be done agreeably to the law, the county cannot afterwards deny its obligation to pay the amount subscribed. In a suit brought to recover the arrears of interest on such bonds, it is not necessary for the holder to show that the grand jury fixed the manner and terms of paying for the stock; nor is it a defence for the county to show that the grand jury omitted to do so. It is enough that the manner and terms of payment were agreed upon between the company and the commissioners. In a suit brought upon the coupons by a *bonâ fide* holder, his right to recover is not affected by the fact that the railroad company sold the bonds at a discount of twenty-five per cent. contrary to the charter, which forbids the sale of them at less than their par value.

In *Mercer County* v. *Hackett*,† it was held that where a county issues its bonds payable to bearer, and solemnly pledges the faith and credit and property of the county, under authority of an act of the Assembly, referred to on the face of the bonds by date, and the bonds pass into the hands of a *bonâ fide* holder for value, the county is bound to pay them; that it is no defence that the act of the Assembly referred to on the face of the bonds authorized their issue only on, and subject to, certain "limitations, restrictions, and conditions," which have not been formally complied with, nor that the bonds were sold at less than par when the act authorizing their issue declared that they should in "no case," nor "under any pretence," be so sold, and that

---

* 1 Black, 386.          † 1 Wallace, 83.

the bonds are in the nature of negotiable instruments. The same principles are announced in *Gelpcke* v. *The City of Dubuque*,* and in *Meyer* v. *The City of Muscatine*.† In the latter case the court say that if the legal authority was sufficiently comprehensive, a *bonâ fide* holder for value has a right to presume that all precedent requirements have been complied with.

By the act of February 10, 1854, the legislature of Wisconsin authorized the supervisors of the town of Grand Chute to make a plankroad subscription to the amount of ten thousand dollars. The bonds in question were signed by the chairman of the board of supervisors of that town, and recited that the subscription had been made by the supervisors of the town, and that these bonds were issued in pursuance thereof for the purpose of carrying out the provisions of that act. The plaintiff was the *bonâ fide* holder for value of the bonds in suit, and his title accrued before their maturity. The cases cited are an answer to the numerous offers to show want of compliance with the forms of law, or to show fraud in their own agents. There are some other exceptions which it is not necessary to consider in detail.

After a careful examination of the whole case, we are of the opinion that the judgment should be

AFFIRMED.