THOMAS GUNN *vs*. UNION RAILROAD COMPANY.

PROVIDENCE—JULY 15, 1905.

PRESENT: Douglas, C. J., Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1)  *Constitutional Law.    Direction of Verdict by Court.*

Art. 7 of the amendments of the constitution of the United States relates only to trials in the courts of the United States. The States are left to regulate trials in their own courts in their own way. The requirement of the fourteenth amendment to the constitution is met if the trial in the State court is had according to the settled course of judicial proceedings.

Art. I, sec. 15, of the constitution of Rhode Island is a conservation, not an extension, of the right of jury trial, providing that in those proceedings in which a right to trial by jury existed at the time of the adoption of the constitution, the right shall continue.

Gen. Laws cap. 251, § 11, providing that the Appellate Division, after considering a petition for new trial may direct entry of judgment and make such further orders in the cause as to law and justice shall appertain, whereunder, upon petition of defendant for new trial, judgment has been directed to be entered for defendant is in conflict neither with Art. 1, sec. 10, of the constitution of Rhode Island which declares that no person "shall be deprived of life, liberty or property unless by the judgment of his peers or the law of the land;" nor with Art. 14, sec. 1, of the amendments to the constitution of the United States which declares that no State shall "deprive any person of life, liberty or property without due process of law," as an infringement of the constitutional right of trial by jury of the plaintiff.

Sketch of the history of granting new trials and reversing verdicts of juries in Rhode Island from colonial times.

TRESPASS ON THE CASE for negligence.  Heard on motion of plaintiff to vacate order directing the case to be remanded to the Common Pleas Division with direction to enter judgment for defendant.  Motion denied.

BLODGETT, J.  After the filing of the opinion in this case, directing the cause to be remanded to the Common Pleas Division with direction to enter judgment for the defendant

(26 R. I. 112), the plaintiff has filed a motion of which the following is a literal transcript:

"The defendant comes and moves to vacate the order of the court directing a verdict to be entered for the defendant because said court has no jurisdiction to enter such order and because said order deprives the plaintiff of his property without due process of law in violation of Section 10 of Article 1 of the Constitution of the State and of the Provisions of the United States wherein a state is prohibited from depriving any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction equal protection of the law.

"CHARLES E. GORMAN,
"C. WOODBURY GORMAN,
"*Attorneys for the Plaintiff.*"

Assuming that the word "defendant" as first used is inadvertently used in place of the word "plaintiff" to designate the moving party, and further assuming that the word "verdict" is inadvertently used in the motion instead of the word "judgment," we proceed to a consideration of the constitutional questions raised therein, observing that the case is now before the full court only on such questions, even if the opinion of the court *supra,* were not *res adjudicata* as to the statutory authority for the action of the court.

At the argument, as well as at the re-argument made necessary by certain changes in the membership of the court, the sole ground urged by the plaintiff that the act in question was unconstitutional was that he was deprived of his property without due process of law, inasmuch as the order of the court directing the entry of judgment, because of the insufficiency of the evidence to sustain the verdict, was an infringement of his constitutional right of trial by jury.

The constitutional provision as to trials by jury is not the same in all the States. Thus, in the constitution of Maryland (1867), the following provision occurs: "Art. 5. That the inhabitants of Maryland are entitled to the common law of England and the trial by jury according to the course of that

law." In the constitution of Rhode Island it is thus expressed: "Art. I, Sec. 15. The right of trial by jury shall remain inviolate." In strictness of construction this is an entirely separate provision from those provisions of the constitution set forth in the record; but inasmuch as both parties have chosen to consider this provision as ancillary to the other, and inasmuch as we are advised that the same question has been raised in other cases now pending and awaiting our decision in the case at bar, we shall consider the question thus broadly presented as though it were a question of the constitutional power of the court to set aside a verdict in a civil case for insufficiency of evidence and to enter judgment thereafter, without remanding the cause for a new trial.

In its federal aspects, the question thus raised is resolved adversely to the plaintiff by the recent decision of the Supreme Court of the United States in *Maxwell* v. *Dow* (1899), 176 U. S. 581–594, where the court says: "In *Walker* v. *Sauvinet*, 92 U. S. 90, it was held that a trial by jury in suits at common law in the State courts was not a privilege or immunity belonging to a person as a citizen of the United States, and protected, therefore, by the Fourteenth Amendment. The action was tried without a jury by virtue of an act of the legislature of the State of Louisiana. The plaintiff in error objected to such a trial, alleging that he had a constitutional right to a trial by jury, and that the statute was void to the extent that it deprived him of that right. The objection was overruled. Mr. Chief Justice Waite, in delivering the opinion of the court, said:

" 'By article 7 of the amendments it is provided that " in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." This, as has been many times decided, relates only to trials in the courts of the United States. *Edwards* v. *Elliott*, 21 Wall. 532, 557. The States, so far as this amendment is concerned, are left to regulate trials in their own courts in their own way. A trial by jury in suits at common law pending in the State courts is not, therefore, a privilege or immunity of national citizenship, which the States are forbidden by the

Fourteenth Amendment to abridge. A State can not deprive a person of his property without due process of law; but this does not necessarily imply that all trials in the State courts affecting the property of persons must be by jury. This requirement of the constitution is met if the trial is had according to the settled course of judicial proceedings. *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 280. Due process of law is process due according to the law of the land. This process in the States is regulated by the law of the State. Our power over that law is only to determine whether it is in conflict with the supreme law of the land—that is to say, with the constitution and laws of the United States made in pursuance thereof—or with any treaty made under the authority of the United States.'

"This case shows that the Fourteenth Amendment in forbidding a State to abridge the privileges or immunities of citizens of the United States, does not include among them the right of trial by jury in a civil case, in a State court, although the right to such a trial in the Federal courts is specially secured to all persons in the cases mentioned in the Seventh Amendment."

This language is, of course, conclusive as to the scope of the provisions of the constitution of the United States as affecting the guaranty of jury trial in civil actions by the States.

If further discussion of the meaning and effect of the words "law of the land," and "due process of law," were required, than is contained in *Gunn* v. *Union R. R. Co.*, 23 R. I. p. 301, there may be added this language of Mr. Justice Bradley in *Missouri* v. *Lewis*, 101 U. S. p. 31: "We might go still further, and say, with undoubted truth, that there is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. . . . . Where part of a State is thickly settled,

and another part has but few inhabitants, it may be desirable to have different systems of judicature for the two portions— trial by jury, in one, for example, and not in the other. . . . If a Mexican State should be acquired by treaty and added to an adjoining State, or part of a State, in the United States, and the two should be erected into a new State, it can not be doubted that such new State might allow the Mexican laws and judicature to continue unchanged in the one portion, and the common law and its corresponding judicature in the other portion. Such an arrangement would not be prohibited by any fair construction of the Fourteenth Amendment." And in *The Justices* v. *Murray*, 76 U. S. p. 278, it is further said that inasmuch as the first ten amendments to the constitution were limitations upon the power of the Federal government and not upon the States, "it follows that the Seventh Amendment (relating to trial by jury), could not be invoked in a State court to prohibit it from re-examining, on a writ of error, facts that had been tried by a jury in the court below."

It is of course obvious that the question here presented is restricted to an inquiry as to the power of the court in civil cases only. The provision of our constitution as to criminal cases differs, indeed, from the provision of the constitution of the United States and from the constitutional provision of a great majority of the other States in that it contains no reference to former jeopardy, and is as follows: "Art. I, Sec. 7. . . . . No person shall after an acquittal be tried for the same offence." This provision in *State* v. *Lee*, 10 R. I. 495, was properly held by this court to mean "that no person who has once been fairly acquitted by a jury upon a proceeding purely criminal can again be put upon trial without his own consent." The inherent power of the court in the absence of a constitutional provision in that behalf is forcibly illustrated in the recent case of *State* v. *Lee* (1894) 65 Conn. 271, in which the case is thus stated by the court: "The defendant was indicted for the crime of murder in the second degree, was acquitted upon trial to the jury, and this is an appeal by the State, in the nature of a motion for a new

trial, on the ground of alleged errors in the charge of the court and in the admission and exclusion of evidence," and a new trial was granted thereon, the court saying (p. 272): "The principle of finality is essential; but not more essential than the principle of justice. A final settlement is not more vital than a right settlement. The adjustment of these principles in the establishment of procedure by means of which the final judgment shall not only settle the controversy, but settle it in accordance with law, is determined in each jurisdiction by considerations of public policy and not by fundamental principles of jurisprudence."

In *Gunn* v. *Union R. R. Co.*, 23 R. I. 291, *supra*, this court held that art. I, sec. 15, of the constitution "means simply that in those proceedings in which a right to trial by jury existed at the time of the adoption of the constitution the right shall continue; the constitution requiring the conservation, not an extension, of the right of jury trial." And see cases cited.

What, then, is the meaning of the words "trial by jury?" They are thus defined by Mr. Justice Gray in *Capital Traction Co.* v. *Hof* (1898), 174 U. S. p. 13: "'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of twelve men before an officer vested with authority to cause them to be summoned and empannelled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of twelve men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on facts, and (except on acquittal of a criminal charge) to set aside their verdict if in his opinion it is against the law or the evidence. This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion. Yet there are unequivocal statements of it to be found in the books."

The power of the court to set aside a verdict in a civil case and the power of the court to direct a verdict in such a case are evidently identical in nature and in substance. In what cases, then, may these powers be exercised by the court?

In *Treat Mfg. Co.* v. *Standard Steel and Iron Co.* (1895), 157 U. S. 674, the rule is thus established by Chief Justice Fuller: "This was an action of trespass on the case. At the conclusion of the trial defendants moved the court to charge the jury to find the issues for defendants, which motion was granted, and the jury was directed, upon the whole case, to return a verdict for defendants, plaintiff duly excepting. Thereupon the jury returned a verdict accordingly; plaintiff moved for a new trial, which was denied, and judgment was given against plaintiff on the verdict. . . . . The only ground relied on to sustain the jurisdiction of this court is that the case 'involves the construction or application of the Constitution of the United States;' because plaintiff in error was deprived of the right of trial by jury. But it is well settled that where the trial judge is satisfied upon the evidence that the plaintiff is not entitled to recover, and that a verdict, if rendered for plaintiff, must be set aside, the court may instruct the jury to find for the defendant. *Grand Chute* v. *Winegar*, 15 Wall. 355; *Marion County* v. *Clark*, 94 U. S. 278; *Herbert* v. *Butler*, 97 U. S. 319.

"If the court errs as matter of law in so doing, the remedy lies in a review in the appropriate court.

"Writ of error dismissed."

*Schofield* v. *Chicago & St. Paul R. R. Co.*, 114 U. S. 615, resembles the case at bar in this respect. The plaintiff was struck from the rear while driving parallel with and attempting to cross a railroad track upon which the view was unobstructed for a considerable distance. He did not look behind him before crossing (p. 617), and the "train was not a regular one, and no train was due at the time of the accident; it was moving at a high rate of speed; it did not stop at the depot" (behind the plaintiff) "and it gave no signal by blowing a whistle, or ringing a bell, after it passed the depot." In the case at bar the plaintiff backed from between the horses and coal team toward the track of the approaching car, also without looking, and was struck from the rear. In the former case the court held "that the plaintiff, by his own showing, was guilty of contributory negligence, whatever negligence there may have been on the

part of the defendant," and sustained the direction of a verdict for the defendant, observing (p. 618): "It is the settled law of this court, that, when the evidence given at the trial, with all the inferences which the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant. *Improvement Co.* v. *Munson*, 14 Wall. 442; *Pleasants* v. *Fant*, 22 Id. 116; *Herbert* v. *Butler*, 97 U. S. 319; *Bowditch* v. *Boston*, 101 Id. 16; *Griggs* v. *Houston*, 104 Id. 553; *Randall* v. *Balt. & Ohio Railroad Co.*, 109 Id. 478; *Anderson County Comrs.* v. *Beal*, 113 Id. 227; *Baylis* v. *Travellers' Insurance Co.*, Id. 316. This rule was rightly applied by the Circuit Court to the present case.

"Judgment affirmed."

In *Coughran* v. *Bigelow*, 164 U. S. 301 (1896), error was alleged in ordering a nonsuit, and the court, after referring to certain cases cited by the appellants, continues (p. 307): "The foundation for those rulings was not in the constitutional right of a trial by jury, for it has long been the doctrine of this court that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed, and that, if the evidence be not sufficient to warrant a recovery, it is the duty of the court to instruct the jury accordingly, and, if the jury disregard such instruction, to set aside the verdict. *Parks* v. *Ross*, 11 How. 362; *Schuchardt* v. *Allens*, 1 Wall. 359; *Pleasants* v. *Fant*, 22 Wall. 116, 120. And in the case of *Oscanyon* v. *Arms Co.*, 103 U. S. 264, it was said by Mr. Justice Field, in delivering the opinion of the court, that the difference between a motion to order a nonsuit of the plaintiff and a motion to direct a verdict for the defendant is 'rather a matter of form than of substance.'" And further discussing *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24 (1890) continues: "It is the clear implication of this case that grant-

ing a nonsuit for want of sufficient evidence is not an infringement of the constitutional right of trial by jury."

In *Metropolitan Co.* v. *Moore*, 121 U. S. 558 (1886), the court considered the meaning of the term "insufficient evidence," and held as follows (p. 568): "We see no reason, however, for supposing that the language in section 804, 'for insufficient evidence,' is to be limited to evidence insufficient in point of law. The words themselves do not import any distinction. It is admitted that according to established rules of procedure in such cases, it is customary and proper for courts of justice, sitting in the trial of causes by jury, to set aside verdicts and grant new trials in both classes of cases; that is, where the verdict rests upon evidence which is either insufficient in law or insufficient in fact. Strictly speaking, evidence is said to be insufficient in law only in those cases where there is a total absence of such proof, either as to its quantity or kind, as in the particular case some rule of law requires as essential to the establishment of the fact. Such, for instance, would be the case where a fact was attested by one witness only, when the law required two; or when the alleged agreement was proven to be verbal, when the law required it to be in writing. In such cases, a verdict might be said to be against law, because founded on insufficient evidence. Insufficiency in point of fact may exist in cases where there is no insufficiency in point of law; that is, there may be some evidence to sustain every element of the case, competent both in quantity and quality in law to sustain it, and yet it may be met by countervailing proof so potent as to leave no reasonable doubt of the opposing conclusion. . . . . So upon the whole evidence in the case the testimony in support of the cause of action, or of the defence may be so slight, although competent in law, or the preponderance against it may be so convincing, that a verdict may be seen to be plainly unreasonable and unjust. In many cases it might be the duty of the court to withdraw the case from the jury, or to direct a verdict in a particular way; and yet, in others, where it would be proper to submit the case to the jury, it might become its duty to set aside the verdict and grant a new trial. That obligation, however, is the result of a con-

clusion of fact, and in such cases the ground of the ruling is, that the verdict is not supported by sufficient evidence, because it is against the weight of the evidence. Therefore it was said by this court in *Randall* v. *Baltimore & Ohio Railroad*, 109 U. S. 478: 'It is the settled law of this court that when the evidence given at the trial, with all inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant.' In many cases, therefore, the evidence is insufficient in law, because insufficient in fact."

We have thus considered at some length the decisions of the highest tribunal in the land because they clearly show the power even of a court created by a sovereignty of derived and delegated authority. The constitution of the United States, art. III, sec. 2, as adopted, provided with certain exceptions as to original jurisdiction not germane to this inquiry, as follows: "In all other cases the supreme court shall have appellate jurisdiction both as to law and fact with such exceptions and under such regulations as the congress shall make." This power was obviously limited and restricted by the Seventh Amendment, which was ratified in 1791, and is as follows: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise reexamined in any court of the United States, than according to the rules of the common law."

The observations of Alexander Hamilton in "The Federalist" (No. 83) show the conditions prevailing in the several States as to the extent of the right of jury trial prior to the adoption of the constitution: "The great difference between the limits of the jury trial in different States, is not generally understood. And as it must have considerable influence on the sentence we ought to pass upon the omission complained of in regard to this point, an explanation of it is necessary. In this State" (New York) "our Judicial establishments resemble, more clearly than in any other, those of Great Britain. We have Courts of com-

mon law, Courts of Probates (analogous in certain matters to the spiritual Courts in England), a Court of Admiralty, and a Court of Chancery. In the Courts of common law only, the trial by jury prevails, and this with some exceptions. In all the others, a single Judge presides, and proceeds in general either according to the course of the canon or civil law, without the aid of a jury. . . . . In Connecticut, they have no distinct Courts either of Chancery or of Admiralty, and their Courts of Probates have no jurisdiction of causes. Their common-law Courts have admiralty, and, to a certain extent, equity jurisdiction. In cases of importance, their General Assembly is the only Court of Chancery. In Connecticut, therefore, the trial by jury extends in *practice* further than in any other State yet mentioned. Rhode Island is, I believe, in this particular, pretty much in the situation of Connecticut. . . . In the four Eastern States, the trial by jury not only stands upon a broader foundation than in the other States, but it is attended with a peculiarity unknown, in its full extent, to any of them. There is an appeal *of course* from one jury to another, till there have been two verdicts out of three on one side. . . .

"The best judges of the matter will be the least anxious for a constitutional establishment of the trial by jury in civil cases, and will be the most ready to admit, that the changes which are continually happening in the affairs of society may render a different mode of determining questions of property preferable in many cases in which that mode of trial now prevails. For my part I acknowledge myself to be convinced, that even in this State it might be advantageously extended to some cases to which it does not at present apply, and might as advantageously be abridged in others. It is conceded by all reasonable men, that it ought not to obtain in all cases. The examples of innovations which contract its ancient limits as well in these States as in Great Britain, afford a strong presumption that its former extent has been found inconvenient; and give room to suppose that future experience may discover the propriety and utility of other exceptions. I suspect it to be impossible in the nature of the thing, to fix the salutary

point at which the operation of the institution ought to stop; and this is with me a strong argument for leaving the matter to the discretion of the Legislature.

"This is now clearly understood to be the case in Great Britain, and it is equally so in the State of Connecticut; and yet it may be safely affirmed, that more numerous encroachments have been made upon the trial by jury in this State since the Revolution, though provided for by a positive Article of our Constitution, than has happened in the same time either in Connecticut or Great Britain."

The provision of sec. 11 of cap. 251, Gen. Laws, empowering this court to "direct entry of judgment, and the date thereof, as the case may be, and may make such other or further orders as to costs or otherwise, in the cause, as to law and justice shall appertain," finds its historical origin and precedent from the petitions from the colonial courts here to the King in Council in colonial times, and its parallel is found in the legislation of other States. The provision commonly appearing therein is to the general effect that the Appellate Court may make such order or enter such judgment as the court below should have made or entered. While the right to order a peremptory nonsuit or to direct or set aside a verdict differs in some respects from the right to reverse a judgment, it is nevertheless true that the power to do one of these acts is essentially the same as the power to do another of them. It therefore becomes instructive to examine the decisions of the courts of other States in this behalf.

Thus, in *Borg v. C., R. I. & P. Ry. Co.*, 162 Ill. 348 (1896), the court says: "The successive constitutions of this State have each guaranteed the right of trial by jury as enjoyed at and before the adoption of such constitution, and have preserved the right to that method of trial as it previously existed. . . . The right of trial by jury at the time of the adoption of the constitution was understood to exist subject to the power of this court, subsequently extended to the Appellate Court, to review the judgments of trial courts on the facts, and to reverse such judgments without remanding the cause for a new trial, and it was this right of trial by jury as so enjoyed

which was preserved and protected by the constitution. The practice of reversing judgments without remanding the cause was continued in this court, and a great number of cases were so reversed up to the organization of the Appellate Courts, as will appear from an examination of the Reports, and the power so exercised in this court was not questioned. . . .

"We have seen that the right of trial by jury as it was enjoyed at the time of the adoption of the present constitution was not the right of an indefinite number of jury trials in the same cause, where an Appellate Court, on a review of the case, should find that a recovery would be merely a perversion of justice. Such right of trial by jury was never deemed to be invaded by the reversal of a cause without remanding it for another trial. Parties still have the right to submit controversies of fact to the consideration of a jury, and the successful party gains all the advantages and benefits following a verdict under the well-established rules of the courts, arising from superior opportunities to judge of the credibility of witnesses. But when, with all the advantages accorded to them, it appears to the Appellate Court that there can not be a recovery which should be allowed to stand, no constitutional right is invaded by a refusal to remand the case for successive trials which must necessarily be followed by successive refusals." See also *Siddall* v. *Jansen et al.*, 143 Ill. 537.

In *Davies* v. *Peoples Ry. Co.*, 159 Mo. 1 (1900), the facts were almost identical with the facts in the case at bar. The plaintiff was unloading beams from a wagon near a street railroad track "and in order to do this he was compelled to stand in the rear and slightly to the west of the west hind wheel of the wagon, thus exposing himself to the danger of being struck by a passing car. At the time of the accident the plaintiff was standing with his back to the approaching car, and was prying up the end of a beam while his assistants were fastening the hoisting apparatus around it. He did not see or hear the car, and the parties in charge of it failed to check its speed or to ring a bell, or give any warning whatever of its approach. For some distance south of the point where the plaintiff was at work, there was a full and unobstructed view of defendant's

track.   The plaintiff admitted on cross-examination that there was barely enough space between the track and the wagon to allow a man to stand sidewise along the side of the wagon and escape injury from a passing car, and that while he was unloading this particular wagon two other cars had passed, and being warned of their approach, he merely had to step aside or turn half way around to escape injury.   He also admitted that he had been employed for some time at the work; that cars were continually passing, and that he was aware of the danger.

.   .   .

"Under these facts what was there for the determination of the jury that the case should have been submitted to it? Certainly it must go by the saying, that the voluntary assuming of a position upon or so near to the tracks of a street railway, over which cars are run every few minutes, that they can not pass without inflicting an injury to the party so positioned, unless the intervention of some independent agency occurs to prevent it, is an act in itself of the grossest negligence.   If in taking the position assumed by the plaintiff, and at the same time engaging in an undertaking, as he says he was, that prevented his seeing or hearing the approach of the cars upon defendant's road, that he knew were due and liable to pass along at any moment, does not constitute an act of negligence that must be said to have contributed to the injury resulting to him, on account of being run against by one of defendant's cars pursuing its usual course upon the tracks, it would be idle to search the field of practical experience for an illustration of what is termed in law an act of contributory negligence. The plaintiff had no right to assume a place of danger upon defendant's tracks and deliberately engage in an undertaking in such a manner as to deprive himself of the benefit of the sense of sight and hearing, the common avenues through which the approach of danger is communicated, and trust that defendant's agents in the course of their employment would be more considerate and watchful for his safety than he himself. .   .   .   It is not the right of a jury, whose office begins and terminates with the consideration and determination of facts (as in a case like this) to consider and pronounce the legal

conclusion flowing from the admitted or ascertained facts. That is the sole prerogative and duty of the court, and can never be properly surrendered to the jury. When the plaintiff himself has shown a state of facts, the existence of which if shown by defendant would have entitled it to an instruction, to the effect that if the jury found the same to be true, the plaintiff was not entitled to recover, and the verdict must be for defendant, what would be the necessity for, and what the office of a jury? The court in writing the instruction in such a case would have pronounced the law's judgment upon the facts, as agreed by plaintiff, and the jury's ratification of it by a verdict would be unnecessary and meaningless, as its disapproval by an adverse verdict would be contemptuous and unwarranted, and the possibility for such latter expression should never be afforded to a jury. . . .

"While under the pleadings, it is true, the burden of proving plaintiff's alleged contributory negligence was primarily upon defendant, that burden was relieved by the plaintiff himself testifying to a state of facts making good the averment of defendant's answer, and as against plaintiff the court could apply to the facts he disclosed, the law's judgment thereon. As to plaintiff, the situation was as upon facts agreed. If the plaintiff was not entitled to recover for the injuries inflicted upon himself by defendant's cars, on account of his contributory negligence, then no possible good could come from a further prosecution of the inquiry as to the extent of defendant's negligence in the premises. The doctrine of comparative negligence has no recognition in this court, and as there was neither allegation nor proof by plaintiff that the injury to him was wantonly or wilfully inflicted by the agent of defendant in charge of its cars, there was nothing left for the jury after plaintiff's contributory negligence was shown by his own statement of the facts.

"The peremptory instruction asked by defendant at the close of plaintiff's testimony should have been given by the court, and for its refusal, its judgment should be reversed, and it is so ordered.

"All concur."

In *Central R. R. Co.* v. *Kent*, 91 Ga. 687 (1893), the court say (p. 690): "It sufficiently appears from the foregoing that when the decision reported in 87 Ga. was made, a majority of this court were convinced that, under the evidence as it then appeared in the record, in no view of the case was the plaintiff entitled to recover. In other words, we were fully satisfied that the washout which produced the calamity resulting in the plaintiff's injuries was caused by the act of God, and that there was no want of diligence on the part of the company in failing to discover it in time to give notice of it to the plaintiff. Accordingly, another new trial was granted, and it resulted in a third verdict, upon substantially the same facts, in favor of the plaintiff. At the last trial there was some additional evidence, but all the members of the court are satisfied that it does not in any material or substantial particular change or vary the case upon its actual merits as it appeared when here the last time. Entertaining this view, Justice Simmons and the writer felt constrained to set the verdict aside, and also to order that the case be dismissed. All of us feel certain that the full truth of this case has been developed, and that further trials of it could not bring out anything new that would be material in substance. On each trial, the plaintiff has undoubtedly made out a *prima facie* case. This it was easy to do, in view of the presumption of negligence raised by the law against railroad companies; but the majority are decidedly of the opinion that, on the last two trials at least, the company has conclusively and satisfactorily rebutted this presumption, and has shown itself free from all negligence or blame. It is manifest, we all think, that the plaintiff can never show a materially different state of facts; that is, can never show a state of facts that will, or should, break down what two of us regard as a perfect reply to the plaintiff's case. Of course, a court can not, and should not, generally undertake to forsee or predict what a party can or can not prove; but after a case has been tried time after time, and this court, in view of all the records sent up, and of the character of the case, is fully satisfied that, in the very nature of things, nothing more can be shown which could or ought to

change or affect the final result, we may with propriety say it is beyond the power of a particular party to show a materially different state of facts, especially when that party has, all along, been represented by able, faithful, and exceedingly diligent counsel, whose efforts in his behalf make it certain that they have brought out all in his favor, and all against the company, which could be proved, and who do not themselves suggest anything material in his favor, or against the company, which further investigation might bring to light. We mean to say that neither the record, nor the argument of this case, either upon the merits or upon the motion to reinstate, suggests any reasonable ground to infer that there is any probability that, upon another trial, any new fact or circumstance would be elicited which could or ought to affect the result. The plaintiff and his witnesses are thoroughly committed to their theory and version of the case, and so are the defendant and its witnesses. All the witnesses who have testified more than once have, in the main, thus far been consistent with themselves, and the new evidence at the last trial did not add any material features to the case as already developed. The policy of the law requires that long and tedious litigation should come to an end, and the direction given in this case was made in accordance with this policy. See the cases cited below. The defendant in two successive trials has vindicated its diligence to the satisfaction of a majority of the court, and there is not the slightest reason to conjecture it would not do so again and again. To protract this litigation would not only unnecessarily impose on the defendant the trouble and expense of so doing, but would be profitless to the plaintiff himself. . . . Their position (*i. e.* counsel for defendant in error) as we understand it, is that this court had no power to give the direction it gave in this case. We hold otherwise, and are free from doubt in so doing. Section 218, par. 2, of the code undoubtedly empowers this court to make a final disposition of a cause; and section 4284 expressly declares that it may 'award such order and direction to the cause in the court below as may be consistent with the law and justice of the case.' These sections certainly confer very large and ample powers upon this

court; large enough, in our opinion, to authorize the direction given in the case at bar.

"In *Harris* v. *Hull, ex'r.* 70 Ga. 838, 839, Justice Hall said: 'One great purpose in establishing this court was to terminate suits, and with this view, it is made its duty not only to grant judgments of affirmance or reversal, but any other order, direction or decree required, and if necessary, to make a final disposition of the cause (Code, section 218), and it is empowered to give to the cause in the court below such direction as may be consistent with the law and justice of the case. Ib. section 4284. Litigation should never be protracted where this, with due regard to the rights of parties, can possibly be avoided. *Interest reipublicae ut sit finis litium* is a maxim so old that its origin is hidden in a remote antiquity, and the policy which it inculcates is so essential as not to admit of question or dispute.'" And see *Railway Co.* v. *Morgart* (1892), 56 Ark. 213; *Jones* v. *Telegraph Co.* 101 Tenn. 442 (1898); *Brownsville* v. *Basse*, 43 Texas, 440 (1875); *Smith* v. *Times Pub. Co.*, 178 Pa. 481 (1897).

In *City of Spring Valley* v. *Coal Co.*, 173 Ill. 497 (1898), affirming *Siddall* v. *Jansen*, *supra*, the court say (p. 503): "The right of trial by jury which is preserved by the constitution is the right as it had been enjoyed before the adoption of that instrument. . . . The question whether a statute infringes the constitutional provision that the right to trial by jury as theretofore enjoyed shall remain inviolate raises a purely historical question and nothing else. It is not to be determined by a consideration of what the legislature ought to do in providing for the submission of issues to a jury, but such arguments are to be addressed to the legislature. The right and the limitation upon the power of the legislature to provide for the determination of controversies by other tribunals are to be decided by an investigation of the question how the right had been enjoyed when the constitution was adopted. This has always been the rule."

In tracing the history of jury trial in Rhode Island, conditions unique in American history are presented. For one hundred and eighty years from the granting of the colonial

charter by Charles II in 1663, to the adoption of the present constitution in 1843, the fundamental instrument of government was the original creation of the king of Great Britain, being at the time of its abrogation the oldest constitutional charter in the world (I Arnold Hist. R. I. 294). More liberal than any other colonial charter when granted, in many respects, the powers, duties, rights, privileges, and restrictions imposed, conferred, and granted thereby endured until a time within the memory of many thousands of persons now living.

The lapse of more than two centuries, with the resulting changes in social and political conditions, has caused this instrument to appear to us of to-day to be antiquated and circumscribed in respect of those provisions which at the time of their creation were far in advance of their time and were of unprecedented liberality, and have also rendered it exceedingly difficult for us to realize that our legal rights are still determined, limited, and defined, in no small degree, by constitutional perpetuation of the provisions of this charter and of the legislation enacted by its authority.

A free charter of practical self-government was granted in these terms: "and from time to time, to make, ordain, constitute or repeal, such laws, statutes, orders, and ordinances, forms and ceremonies of government and magistracy, as to them shall seem meet, for the good and welfare of the said Company, and for the government and ordering of the lands and hereditaments, hereinafter mentioned to be granted, and of the people that do, or at any time hereafter shall, inhabit or be within the same; so as such laws, ordinances and constitutions, so made, be not contrary and repugnant unto, but as near as may be, agreeable to the laws of this our realme of England, considering the nature and constitution of the place and people there; and also to appoint, order and direct, erect and settle, such places and courts of jurisdiction, for the hearing and determining of all actions, cases, matters and things, happening within the said colony and plantation, and which shall be in dispute, and depending there, as they shall think fit."

The ample scope of the powers granted in this charter more

clearly appears when it is compared with the charter of 1691 of Massachusetts. In the latter instrument the crown reserved the right to appoint the governor, and power was given to the "great and Generall Court," to pass only such laws as "be not repugnant or contrary to the Laws of this our Realm of England," without containing the qualifying clause contained in the Rhode Island charter that such conformity need only be "as near as may be considering the nature and the constitution of the place and people there." Even so restricted these laws were to be first presented to the royal governor for his approval in writing or otherwise were to be of no effect; and even when so approved were then to be submitted to the crown for approval within three years after such presentation.

Similarly the commission granted in 1679, creating the royal province of New Hampshire, reserved the appointment of the governor (or president) to the crown. And the powers of legislation conferred on the General Assembly and the power of the crown in respect of the same are thus expressed and limited:

"At ye meeting of which Gen. Assembly we do hereby will, authorize and require ye Pres. of ye said Councell to mind them in ye generall, what is to be intimated in ye proclamation aforesaid.

"That he recommend them ye making of such Acts, Laws, and Ordinances, as may most tend to ye establishing them in obedience to our authority; their own p'servation in peace and good Governmt, and defend against their enemies, and that they do consider of the fittest ways for raising of taxes, and in such proportion as may be fit for ye support of ye sd Governmt. And our will and pleasure is, and we do hereby declare, ordain, and grant, that all and every such Acts, Laws, and ordinances, as shall from time to time be made in and by such general Assembly or Assemblies, shall be first approved and allowed by the Pres. and Councell for the time being, and thereupon shall stand and be in force until ye pleasure of us, our heirs and successors, shall be known, whether ye same Laws and ordinances shall receive any change or confirmation, or be totally disallowed and discharged.

"And, therefore, our will and pleasure is, that ye Pres. and Councell do, and shall from time to time transmit and send over unto us, our heirs and successors, and our and their Privie Councell for the time being, all and every such acts, Laws and Ordinances, by the first ship yt shall depart thence for Engd, after their making."

Indeed, in all the other colonies except Maryland and Connecticut, the king possessed the power of abrogating the laws, and they were not final in their authority until they had passed under his review.

In marked contrast to these limitations and restrictions is to be placed the official opinion of the attorney-general and the solicitor-general, rendered in 1731 to George II, in response to a letter from Governor Joseph Jenckes, upon a memorial from certain citizens of Rhode Island, complaining that a certain act of the General Assembly relative to the emission of paper money was in violation of certain acts of Parliament and Orders in Council. (4 R. I. Col. Rec. p. 461.) The crown officers say, in giving their opinion: "In this charter, no negative voice is given to the Governor, nor any power reserved to the crown of approving or disapproving the laws to be made in this colony." As to the question stated, "Whether His Majesty hath any power to repeal or make void the above mentioned act of Assembly, we humbly conceive, that no provision being made for that purpose, the crown hath no discretionary power of repealing laws made in this province; but the validity thereof, depends upon their not being contrary, but as near as may be, agreeable to the laws of England, regard being had to the nature and constitution of the place, and the people. Where this condition is observed, the law is binding; and where it is not, the law is void as not warranted by the charter." In apparent exercise of the ample authority contained in the charter "also to appoint, order and direct, erect and settle such places and courts of jurisdiction for the hearing and determining of all actions, cases, matters and things happening within the said colony and plantation, and which shall be in dispute and depending therein as they shall think fit," in 1677 the General Assembly enacted the following.

statute (Pub. Laws R. I. 1636–1705 p. 26): "A rehearing after Iudgement Granted. *It is Enacted* & we do declare yt Either the Plantiff or Defendant Shall Each of them haue Liberty of one rehearing if Either of them defire it & no more Provided he that Defire it whether Plantiff or Defendant Shall give in Double bond of wt ye Defendant gave for his former Appearance wch bond togeather wth four pounds or ye Uallue of ye Bill of Costs Shall be given into ye Recorders Office wthin Ten days after Iudgement Granted & this Cost not to be Recoueable Again Except ye Iury See Good Caufe to give it & for this Caufe the Execution Shall remain, in the Recorders Office Tenn dayes after Iudgement Granted before it goe forth and so ye Recorder shall Stop ye Execution wch Shall be notice Sufficient for the Other party to Prepaire for a Tryall according to Law "The next Court *And it is Enacted* That in all Cafes wherein any Perticular Perfon is ye Profecutor he or they Shall pay the Iury."

This right of a second jury trial as of course, either in the same court or by appeal in another court, and without showing error of law or misconduct in the first trial, though a distinct departure from the rule of the common law, nevertheless remained in force in Rhode Island for more than two hundred years, being finally abolished by Pub. Laws R. I. cap. 674, April 12, 1878, and cap. 743, March 10, 1879.

In *United States* v. *Wonson*, 1 Gall. 5 (1812), Mr. Justice Story, then holding the United States Circuit Court for the District of Massachusetts, said (p. 14): "We should search in vain then in the common law, for an instance of an appellate court retrying the cause by a jury while the former verdict and judgment remained in full force."

While that case arose under the law of Massachusetts, the statute of Rhode Island then in force and referred to in the opinion (p. 15) was as follows: (Rev. 1798, p. 150, sec. 8.) "*And be it further enacted,* That any party aggrieved at the judgment of the Court of Common Pleas in any county, may appeal to the next Supreme Judicial Court to be holden in the fame county, where both parties shall have the benefit of any

new and further evidence; *Provided* the appellant fhall give bond in the Clerk's office of the Court appealed from, within five days after the rifing of the fame, to profecute fuch appeal with effect, and in default thereof to pay coft.''

And the court continues (p. 16): "If, indeed, the act'' (of Congress) "of 1803 gives on all appeals this new trial, however consonant it may be with our own habits, we should recollect that it overthrows the established jurisprudence of at least three fourths of the States, and abolishes a fundamental principle of the common law.''

In further commenting upon the provision of the Seventh Amendment to the Constitution of the United States relative to· "Suits at common law,'' &c., Mr. Justice Story continues (p. 20): "Beyond all question, the common law here alluded to is not the common law of any individual State (for it probably differs in all), but it is the common law of *England,* the grand reservoir of all our jurisprudence. . . . Now, according to *the rules of the common law,* the facts once tried by a jury are never re-examined, unless a new trial is granted in the discretion of the court, before which the suit is depending, for good cause shewn; or unless the judgment of such court is reversed by a superior tribunal, on a writ of error, and a *venire facias de novo* is awarded. This is the invariable usage settled by the decisions of ages.''

These citations show at some length the peculiarities of the system of jury trial prevailing in Rhode Island almost from the beginning of the colony, and they show also that the rules of the common law of England are in many respects inapplicable upon the force and effect of the verdict of a jury in a civil case, under what Mr. Justice Story thus styles as "the common law'' of this State. Not only was the verdict of a jury not a finality here, it was a mere nullity if appealed from; and our ancient records show that, contrary to the rule of the common law, such verdicts were not only modified and reversed by the verdict of a jury, on the second trial on appeal, but they also show that, which is even more unprecedented, in case the prevailing party, whether plaintiff or defendant, did not appear at the second trial, the court itself reversed the verdict of the

jury and entered final judgment without remanding, even in actions relating to real estate.

Thus, at the September term, 1762, in Providence county, is found the following record: "Thomas Broadway of Smithfield in our County of Providence Yoeman Appellant. Darius Sessions & Jabez Bowen Junr. both of Providence in our said County Merchants Appellees. The foundation of this Action was an Action of Entry sur Desisin Commenced and Prosecuted by the said Darius & Jabez against the said Thomas, at an Infer. Court of common Pleas held at Providence, in and for the County of Providence on the Third Monday of June A. D. 1762. When and where the said Darius & Jabez obtained Judgement against the said Thomas for the Lands described in his Declaration with the Cost of Suit—Taxed and allowed at £32ₙ 5ₙ 10. from which Judgement the said Thomas appealed to this Court, the Case being now called the said Darius and Jabez refused to appear and defend the said Appeal —whereupon being Thrice called & not appearing he was Default It is therefore considered by this Court that the aforesaid Judgement of the Infer. Court be reversed and the same is hereby reversed and the said Thomas is hereby assigned the Lands described as aforesᵈ and his of Suit in this behalf expended Taxed at £138ₙ 12ₙ 4ₙ." An examination of the papers in the case shows that the judgment below was rendered upon the verdict of a jury.

But this is not all. It not infrequently happened that the verdict on appeal reversed the verdict of the first jury. Accordingly, in 1732, a third jury trial was given as of course, in real actions relating to titles of lands(Digest, 1730, p. 24), and this right was further extended to all cases in 1743 (Digest, 1745, p. 282), in a proceeding entitled a "Writ of Review." This third jury trial might affirm, modify, or reverse the second verdict, and is even further evidence of the unwillingness to rely upon the infallibility of a single jury trial. This method of procedure was in force at the time of the adoption of the constitution in 1843. Section 1 of "An Act granting Reviews in Civil Actions" (Digest, 1822, p. 133) being as follows: *"Be it enacted by the General Assembly, and by the authority thereof it is*

*enacted,* That either party aggrieved at the judgment of the supreme judicial court in any suit, in which one judgment only shall have been given against him, may at any time within one year review the same, and have one trial more in the same court; and on such review there shall be no further pleadings, but the cause shall be tried on the issue appearing on the record to have been originally joined by the parties; and the execution upon such judgement given in the supreme judicial court shall not be stayed by such review, unless a bond shall be given as in this act provided; and such party shall have the liberty to offer any further evidence; and when either party shall bring a writ of review, and enter the same, the whole cause shall be tried, as if no judgment had been given therein; and the former judgment may be reversed in whole, or in part, or greater damages or less, or no damages, may be given, as the merits of the cause, upon law and evidence, shall require, in the same manner as though both parties had brought their writs of review "

This method of procedure, by writ of review, was not repealed until the Digest of 1844 was enacted, after the adoption of the constitution; and it is also proper to observe that it is the second jury trial on appeal which was abolished in 1878, leaving only the right to the first jury trial thereafter, and how little of the quality of finality attached to such a first verdict in a civil case has already been made to appear.

In criminal cases the powers exercised over verdicts by the courts in Rhode Island, almost from the granting of the charter, were such as unquestionably contravene our present constitutional provisions. Whether the powers exercised were granted or assumed the action of the "General Court of Tryalls," then the highest court of the colony (saving always an appeal to the General Assembly), was the action of a court created by a General Assembly under the provisions of the charter of 1663, and which was still the fundamental instrument of the government of the State until 1843. An examination of the ancient records of this court in Newport county shows these cases, among others, in the years immediately following the granting of the charter of 1663:

"At The Gen'l Court of Tryalls held for his Maj'ties Collony at Newport the 18th day of October 1671. Upon Indictment by the Gen'l Aturney against Mathew Boomer of Newport for that the said Boomer did kill several Sheep that were not his owne and Converted them to his owne use which is Gran Larceny The said Boomer, Beinge in Court Cald apeerd and Answerd, pleads Not Guilty and Referrs himselfe for Tryall to God and the Cuntry—. The Jurrys Verdict Not Guilty. The Kings Aturney on the Kings behalfe desireing a stop of Judgment in the Case the Court alsoe beinge Unanimously dissatisfyed with the Jurrys Verdict doe see cause to grant the Aturneys Request and doe stop Judgment thereon. Therefore the Court doe see cause and doe continue his former bonds to be of full force untill the next Gen'l Court of Tryalls. . . . Att the Gen'l Court of Tryalls Held in his Maj'ties Name at Newport the sixth day of May 1672. Whereas Mathew Boomer of Newport was by the last Court of Tryalls bound to this Court, he beinge in Court Cald apeerd and proclamation beinge made in open Court whither any person had any thinge or cause to Eleadge against the said Boomer, and none comeinge in to Complaine this Court doe see Cause to acquitt the said Boomer of his Bonds payinge fees—.

In the same year "Upon Indictment to the Gen'l Aturnoy against Francis Asleton (prissoner) for murdering John John Cockrum alias Cockerill: The said Asleton beinge brought into Court was called forth to Answer Ask'd whither Guilty or not Guilty, pleads Not Guilty and Referrs himselfe for Tryall to God and the Cuntry.

"The Jurries Verdict. Not Guilty.

"The Court Centances is that the said Asleton doe Remain in prisson until he hath paid his ffees, which shall be paid out of his Estate already Sequestered and then the Rest to be Returned to him. And that the said Asleton shall within tenn daies Depart Rhode Island and to be kept close prissoner until he doth depart and shall not Returne againe to Inhabitt in any Towne of the Collony without leave from the Majestrates in each Towne: Upon his perrill."

In 1678, "Upon Indictment by the Gen'l Solicetor against

Richard Cowley prissoner for faloniously stealing and taking away sheep which were the proper Estate of Mr. Caleb Carr sen. and Capt John Joanes on the Island Quononoquit

"He beinge brought into Court and asked wither Guilty or Not Guilty pleaded not Guilty and referrs himselfe for Tryall to God and the Cuntry

"The Jurrys Verdict Not Guilty.

"The Court Committ him unto the keeper till called for The said Cowley beinge called for the keeper made answer that he had broken prisson and made his escape: The Court doe empower the Officers to seize on any Estate they can finde of the said Cowley's to pay their Just ffees."

In 1681, "On Indictment of the Gen'l Solicetor against John Osbourne now prissoner for beinge a Rober ec. hee beinge brought into Court and his Indictment to him Read and he ask'd whether Guilty or not Guilty pleads Not Guilty.

"The Case Committed to the Jurry.

"Verdict, Not Guilty.

"The Sentance of the Court is that John Osbourne shall depart this Collony within three Days after this 7th of October and shall not Continue here longer Except by leave of the Governor, And if he bee found in this Collony Contrary to this Sentance then by warrant under the hand of the Governor, Dept Governor or any Assistant or more to bee apprehended and sent to prisson for his contempt *there* to Remaine till by Authority Released."

Unwarranted as these orders seem to be to-day, it is nevertheless unquestioned that these judges were not the irresponsible appointees of the crown, and thus not accountable to the people of the colony, but were elected annually by the people, and were thus responsible to them for any transgression of their authority or for any unwarranted assumption of power.

The powers exercised and the right asserted over verdicts and judgments by the overshadowing General Assembly are so well known as to require no extended comment. Its claim to the exercise of judicial powers finds its precedent in the act passed in 1647, under the charter of 1644, as follows (1 R. I. Col. Rec. 205): "And in case any man sues for Justice against

an officer or other, and he cannot be heard, or is heard and cannot be righted by any Law extant among us, then shall the partie grieved petition to the Generall or Law-making Assemblie, and shall be relieved."

In 1680 "An Act Granting Appeals to the General Assembly, from the General Court of Tryals," was passed by which the General Assembly was specifically authorized to "Confirm, Alter, Amend or Reverfe such Judgments and give a new Judgment thereupon as to the said Assembly shall appear to be agreeable to Law and Equity" (Digest 1719 at p. 33, Digest 1730 p. 28), as follows:

"*Be it enacted by the General Affembly, and by the Authority of the fame.* That in all Perfonal Actions, where either Plaintiff or Defendant, fhall obtain two Judgments for him at the General Court of Tryals in one Action and Caufe brought to the faid Court; That the other Party againft whom faid judgments were given, fhall have Liberty to Appeal to the next General Affembly, from the laft Judgment for Relief, who may if they fee Juft and Reafonable Caufe, Confirm, Alter, Amend, or Reverfe fuch Judgments, and give a new Judgment thereupon, as to the faid Affembly shall appear to be agreeable to Law and Equity: And that each or either Appellant or Appellee, fhall and may have Liberty of giving in new Evidence upon fuch Appeal," &c.

In 1712 an act was passed (4 R. I. Col. Rec. 136) in effect repealing the act of 1680 in consequence of the decision of the Queen in Council, in 1710, adverse to the jurisdiction of the General Assembly in the case of *Brenton* v. *Remington* (4 R. I. Col. Rec. p. 48). In 1741 a so-called "Court of Equity" was established (Digest 1745, p. 239) to which was given the power of reversing judgments, as follows: "And that for the Future there be a *Court of Equity* appointed and eftablifhed in this Government, to confift of Five Judges to be chofen annually by the General Affembly, and to be commiffionated, any three of whom to be a Quorum; who are hereby empowered and authorized to hear all Appeals from the Judgments of the Superior Court in Perfonal Actions, and to give a Determination on faid Appeals, by affirming, reverfing, or altering the

Judgments of faid Superior Court, agreeble to *Law and Equity,* in as full and extenfive Manner as the General Affembly hath been accuftomed to do." In 1742 this act was repealed by the act creating the procedure by "Writ of Review." (Digest 1745, p. 282.)

If Lord Bellomont may be believed, it was the ancient custom of the General Assembly to reverse the verdict of juries. In his official report to the Lords of the Board of Trade on the alleged irregularities of Rhode Island, made in 1699, he charges that (3 R. I. Col. Rec. 386): "Sec. II. The Generall Assembly assume a judicial power of hearing, trying and determining of civil causes, removing them out of the ordinary Courts of Justice and way of tryall, according to the course of the common law, alter and reverse verdicts and judgments, the Charter committing no judicial power and authority unto them." At this time the act of 1680 had not been repealed.

There remains for consideration one other tribunal to which appeals might anciently be taken from the verdict on a writ of review—The King in Council.

The right of the crown to entertain appeals in civil cases from all colonial courts was asserted by the crown as early as 1698 in the following order in council addressed to the colony of Connecticut:

"Whitehall, March the 9th, 1698.

"His Majesty in councill approving of what is proposed by the Councill of Trade in their said representation, is pleased in order that the governor and company of the colony of Connecticutt be required to take care that no obstruction of the course of justice be practised or allowed amongst them; but that the respective cases mentioned in the said representation, and any other whatsoever that may hereafter happen upon differences between man and man about private rights, be fairly heard and judged in the proper methods of the courts established in that colony. And in case the petitioners in the aforesaid causes, or any of them, or any other persons, shall think themselves aggrieved by the sentence or sentences which may be there given, they may thereupon be allowed to appeal to his Majesty in council. And that copies of all records and

other proceedings in all such respective cases be transmitted hither, in order to a final hearing and determination thereof before his Majesty in councill. And that in all such cases, the governor and company of the colony of Connecticutt do take notice that it is the inherent right of his Majesty to receive and determine appeals from all his Majesty's colonys in America; and that they do govern themselves accordingly. And the right honourable the Councill of Trade are to signify this his Majesty's pleasure to the governor and company of the colony of Connecticutt accordingly.''

In 1716 was decided the case of *Christian* v. *Corren,* which is thus reported in I Peere Williams' Reports, 329: "The Earl of Derby, King of the Isle of Man, made a decree in that island concerning lands there; and the person, against whom the decree was made, appealed hither.

"One (and indeed the principal) question was, whether an appeal did lie before the King in council, there being no reservation in the grant made of the Isle of Man by the crown, of the subject's right of appeal to the Crown.

"And it was urged for the appeal by myself (who alone was of counsel with the appellant), that it appearing, in this case that H. 4. had granted the Isle of Man to the Earl of Derby's ancestors, to hold by homage and other services, though there was no reservation of the subject's right of appeal to the Crown, yet this liberty was plainly implied.

"For that such liberty of appeal lay in all cases where there was a tenure of the Crown; that it was the right of the subjects to appeal to the sovereign to redress a wrong done to them in any court of justice; nay, if there had been any express words in the grant to *exclude* appeals, they had been void; because the subjects had an inherent right, inseparable from them *as subjects,* to apply to the Crown for justice. And on the other hand,

"The King, as the *fountain of justice,* had an inherent right, inseparable from the Crown, to distribute justice among his subjects; and if this were a right in the subjects, no grant could deprive them of it; the consequence of which would be, that in all such cases, viz. where there were words exclusive of such

right of appeal, the King would be construed to be deceived, and his grant void; also precedents were cited in point.

"Lord Chief Justice Parker, who assisted at Council upon this occasion, thought that the King in Council had necessarily a jurisdiction in this case, in order to prevent a failure of justice. . . . Whereupon their Lordships proceeded in this appeal, and determined in favour of the appellant."

Both the foregoing requirements of allegiance and tenure were fulfilled in Rhode Island, inasmuch as by the express terms of the charter it was provided as follows: "And further our will and pleasure is, and we do, for us, our heirs and successors, ordain, declare, and grant unto the said Governor and Company, and their successors, that all and every the subjects of us, our heirs and successors, which are already planted and settled within our said Colony of Providence Plantations, or which shall hereafter go to inhabit within the said Colony, and all and every of their children, which have been born there, or which shall happen hereafter to be born there, or on the sea, going thither, or returning from thence, shall have and enjoy all liberties and immunities of free and natural subjects within any the dominions of us, our heirs and successors, to all intents, constructions and purposes, whatsoever, as if they, and every of them, were born within the realm of England." And the tenure of the lands was thus specified: "to be holden of us, our heirs and successors as of the manor of East Greenwich in our county of Kent, in free and common soccage, and not in capite nor by knight service," &c., the manor of East Greenwich long having been a royal manor. And see Blackstone Com. vol. 1, p. 108.

The first legislation of the colony subsequent to the charter of 1663 (relative to such appeals) is to be found in "An Act for the Calling of Special Courts," passed in 1666 (Digest 1719, p. 18) for the benefit of "Merchants, Sea-faring Men or other Transient Persons," and which reserves to a party aggrieved "The Liberty of Appealing to His Majesty in Council in England as in other cases. is usually allowed," apparently recognizing such a right of appeal as having existed as of right from the earliest times.

It would serve no useful purpose to enlarge upon the many acts of Colonial legislation regulating such appeals, or the rules and orders in council relative thereto. A summary of the action of the King in Council on fifty-nine appeals from Rhode Island, between 1735 and 1776, as shown by the Privy Council Register, is to be found in the Report of the Proceedings of the American Historical Association of the United States, 1894 (p. 337), contained in a paper by Mr. Harold D. Hazeltine, as follows: "Twenty-two of these appeals were dismissed for non-prosecution, one of them being afterwards reaffirmed. In fifteen the decisions of the Colonial Courts were reversed and in two of these the Council sent directions to the lower tribunal. In eleven the decisions of the Colonial Courts were affirmed. Six previous decisions were varied, one of them chiefly as to the rate of interest on bills of credit for £28,179, the damages in another being reduced, a peremptory order issued in a third, and two of the remaining three being remitted. In one both the appeal and the cross-appeal were dismissed; one was referred back to the Colonial Court with special directions; the verdict in one was set aside and a new trial in the colony directed; one was simply dismissed and in the remaining one a peremptory order was issued to the Colonial judges to carry out the Council's decision in a previous suit by the same parties."

The following case from our records in Newport county shows that after a judgment for plaintiff in the Inferior Court, followed on appeal by a second judgment for plaintiff in the Superior Court, and the latter judgment confirmed by a verdict and a judgment for the plaintiff on the "writ of review," the Privy Council on Appeal reversed all the three judgments for the plaintiff and dismissed the case.

The record shows that in 1741 Joseph Power brought an action of account against David Vanburgh and Samuel Carpenter, in the Inferior Court of Common Pleas in Newport County, "and thereby laid his damages at £3,000 current money of New England. To which Action the Petitioners appeared and pleaded that they had fully Accounted with the said Power. And Issue being joined the said Action came on to

be tryed" and Power received judgment for £459„ 13„ ‘3 and costs. "Whereupon the Petitioners Appealed from the Judgment of the said Inferior Court to the then next Superior Court of Judicature and thereupon the said Judgment of the said Inferior Court was on the 27th of March, 1744, affirmed with costs of Suit in the said Superior Court." That thereafter the petitioners brought their writ of review, and that "the said Action came on to be tryed at a Superior Court of Judicature held on the 26th of March 1745 on the Petitioners said Writ of Review when the Jury found the following Verdict—Viz. ‘We find that the plaintiffs on Review shall Account with the Defendant, which Verdict was accepted.—’ "

The record thus shows the Appeal to the King in Council, as follows: "The Lords of the Committee in Obedience to Your Majestys said Order of Reference this day took the said Petition and Appeal into their Consideration, and heard all partys therein concerned by their Counsel learned in the law, and do thereupon Agree humbly to Report as their Opinion to Your Majesty, that the said Verdict should be Discharged and set aside, and that the said several Judgments should be reversed, and the said Action be discharged and dismissed.—

"His Majesty this day took the said Report into Consideration and was pleased with the Advice of His Privy Council, to Approve thereof, to Order, as it is hereby Ordered, that the said Verdict be discharged and set aside, the said several Judgments reversed, and the said Action discharged and dismissed.—

"Whereof the Governor and Company of His Majestys Colony of Rhode Island and Providence Plantations for the time being, and all others whom it may concern, are to take Notice and govern themselves accordingly."

We have thus seen that, acting under a charter conferring unusual powers, the General Assembly in 1677 first enacted the provision for a second jury trial as of course, and that such was the law of the colony and of the State for more than two hundred years, until 1878; that such legislation, as expressed by Mr. Justice Story, "abolished a fundamental principle of the common law" of England in this respect: That from 1732 to 1844, a period of more than one hundred years, a third trial

could be had as of course, on a writ of review. That even from such third jury trial on appeal to the King in Council prior to the Revolution prior judgments and verdicts were reversed without remanding for new trial. That a single verdict was reversed on appeal by the Appellate Court itself upon default of appearance of either party to the appeal, even in actions relating to real estate. To these observations may be added the words of Chief Justice Ames in *Taylor & Co.* v. *Place*, 4 R. I. (p. 352 note): "It is beyond question, however, that in colonial times, prior to 1741, and subsequent thereto, and especially after the trammels of the mother country had been removed by the Revolution, the general assembly, by way of petition in the nature of an appeal, exercised a controlling power over the judicial determinations of the courts of the colony, giving in what they deemed 'hard cases,' a relief called by them *equitable* relief, though without the slightest attention to the principles or restraints of any established system of equity jurisprudence."

Prior to the adoption of the constitution the verdict of a jury in a civil case possessed no element of finality if appealed from or if reviewed, and such elements of finality as then appertained to jury trials in civil cases arose only after at least two concurring verdicts free from error in law as well as from misconduct at the trial, and to obtain two such concurring verdicts three jury trials might be required. It is obvious that this was a very different requirement from the requirement of the common law of England in this respect, and upon which the argument of the plaintiff is based. His contention, indeed, would require the court to impute to the finding of a verdict by a jury a finality prior to the adoption of the constitution, which could, at least, only be given by two juries and which might require the consideration of three juries. And this without reference to any action of king or of General Assembly.

As it is evident that the precedents and principles of the common law of England were not decisive of the effect of a verdict of a jury in a civil case in Rhode Island under the law of the State as it existed at the adoption of the constitution, so it is equally evident that the anomalous and unique conditions

which prevailed here are not precedents·in States in which the rule of the common law of England in this respect has always remained in full force.

Tested even by the rule of that common law as authoritatively expounded in the decisions cited from the Supreme Court of the United States, we are clearly of the opinion that a verdict should have been directed for the defendant in the case at bar, and if rendered for the plaintiff should have been set aside. Nor do we see any lack of constitutional authority in the legislature to enact the statute under which the court has acted, or in the action of the court thereunder on the facts disclosed in the case at bar.

We are of the opinion, further, that the plaintiff has not been deprived of his property without due process of law, as contended by him, on the record and at the argument, and that the motion to vacate the order in question must be denied.

*Charles E. Gorman,* for plaintiff.

*Henry W. Hayes, Frank T. Easton, Lefferts S. Hoffman, and Alonzo R. Williams,* for defendant.